**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------X
CHRISTINE D. COLLINS, A PROFESSIONAL
CORPORATION and
CHRISTINE DEANNE COLLINS, individually,       Civ. A. No. 1:23-cv-353

                           Plaintiffs,

                                **JURY TRIAL DEMANDED**

      -vs-

MCA RECEIVABLES, LLC D/B/A ALLY FUNDING GROUP,
YISROEL C. GETTER; MARTIN MILLER; PARAGON CAPITAL
SOURCE, LLC; THE WOODS LAW FIRM, LLC;
JOHN DOES 1-10; and
JOHN DOE INVESTORS 1-10,
                             Defendants.
--------------------------------------------------------------------X

## COMPLAINT

Plaintiffs CHRISTINE D. COLLINS, A PROFESSIONAL CORPORATION and

CHRISTINE DEANNE COLLINS (collectively "Plaintiffs"), as and for their Complaint against

MCA RECEIVABLES, LLC D/B/A ALLY FUNDING GROUP, YISROEL C. GETTER;

MARTIN MILLER; PARAGON CAPITAL SOURCE, LLC; RODERICK D. WOODS; JOHN

DOES 1-10; and JOHN DOE INVESTORS 1-10, (collectively "Defendants"), state as a follows:

## NATURE OF THE ACTION

1.     This is an action against two merchant cash advance ("MCA") companies that are

controlled and manipulated, respectively, by the individual Defendants to carry out fraudulent

schemes to collect upon unlawful debts and otherwise fraudulently obtain funds from Plaintiffs

(and hundreds of other similarly situated victims) through the use of their sham MCA

agreements as further defined below ("MCA Agreements").

2.     Unfortunately, the type of conduct by Defendants here is a ballooning national

problem that has raised the attention of both state and federal regulators.

3.    In November 2018, Bloomberg News and renowned journalist Bethany McLean (of Vanity Fair acclaim) published what would be the first in a series of groundbreaking news articles exposing the abuses of the MCA industry, and its use of confessions of judgments to seize out-of-state bank accounts.[1]

4.    The New York Legislature quickly took action, banning the use of out-of-state confessions of judgment in September 2019. In support, the Legislature cited Bloomberg News.

5.    More recently, on February 10, 2022, Bloomberg News exposed a new tactic being abused by the predatory MCA industry, and a tactic used by the Defendants here.

6.    Specifically, predatory MCA operators operate out of New York but abuse an apparent loophole under Connecticut procedural law to collect upon their unlawful debts. In doing so, the operators freeze out-of-state bank accounts by simply serving legal papers (which have not been reviewed or scrutinized by any court) on a bank that has a branch located in Connecticut. As justification for their bank freezes, the operators represent and attest under oath that their small business victims owe them a debt and that the operators are unaware of any defenses to their claims.

7.    According to Bloomberg News, this Connecticut loophole was used more than 180 times in 2021. The result of this tactic is often catastrophic because the operators can freeze out-of-state bank accounts without any notice whatsoever.  Once frozen, the operators can then extort payment under duress due to their victims' need to save payroll or pay other necessary business expenses, such as insurance, taxes, rent and inventory.

8.    This tactic is especially harsh because even when the small business victim

---

[1] https://www.yahoo.com/entertainment/merchant-cash-advances-salvation-small-businesses-payday-lending-reincarnate-161835117.html; https://www.bloomberg.com/confessions-of-judgment

capitulates to the operator's extortionate demands, it is often too late because the release of those bank accounts may take days to unfreeze due to the processing delays and procedural constraints of individual banks and their levy departments.

9.      This in fact has occurred with Plaintiffs as it relates to Defendants MCA RECEIVABLES and GETTER, who recently levied against Plaintiffs' accounts without any notice whatsoever, creating catastrophic harm for Plaintiffs.

10.      In doing so, Defendants MCA RECEIVABLES and GETTER violated 42 U.S.C. § 1983 by violating Plaintiffs' Fourteenth Amendment right to Due Process under the color of Connecticut state law. Among these intentional violations of due process, Defendants, like here, knowingly and purposely issue Prejudgment Writs of Attachment to third-party banks without first filing a complaint in state court, and without serving notice. Instead, Defendants require Plaintiffs to execute form contracts of adhesion waiving their rights to a hearing, while at the same time agreeing to the jurisdiction of two different states, Connecticut and New York. Thus, the first notice received by Plaintiffs is when their bank accounts become frozen.

11.      Plaintiffs here are victims of Defendants' unlawful lending practices.

12.       Plaintiff CHRISTINE D. COLLINS, PC is a medical practice providing women's health services and is run by a private physician located in Beverly Hills, California that desperately needed a cash infusion.

13.      As a result, on September 23, 2022, Plaintiff CHRISTINE D. COLLINS, PC entered into an agreement with Defendant MCA.

14.      Plaintiff CHRISTINE COLLINS, who is the principal of CHRISTINE D. COLLINS, PC, was forced to enter into a personal guarantee under the agreement.

15.      Defendant MCA, who was supposed to advance $250,000 under this agreement,

in fact only advanced $176,500, claiming ~$75,000 in various "fees."

16.    Then, Plaintiffs were somehow supposed to pay back the sum of ~$350,000 by Defendant pulling $7,500 out of the PC's bank account every day for approximately 47 days.

17.    In other words, Defendant's were going to receive $100,000 in interest on a $250,000 loan (40%) in only 47 days.

18.    This is an effective interest rate in the triple digits. The maximum interest rate permitted under the criminal usury laws of New York is 25%. Accordingly, Defendants have been taking interest that is many multiples above the amount allowed under the criminal laws of this State.

19.    The interest rate is even far worse due to Defendants' typical scheme of only advancing a portion of the amount promised, and then lending the merchant back its money, at a criminally usurious interest rate.

20.    Thus, Defendant MCA "purchased" $349,750 but only advanced $178,500.

21.    Thus, Defendant was earning $171,250 interest on only $178,500, an interest rate of 95% for the 47 days, or more than 737% for the year, or more than 29 times New York's criminal usury rate.

## **THE PARTIES**

22.    Plaintiff CHRISTINE D. COLLINS, PC is a California professional corporation, with its principal place of business located in Beverly Hills, California.

23.    Plaintiff CHRISTINE D. COLLINS is an individual and citizen of California.

24.    Defendant MCA RECEIVABLES, LLC D/B/A ALLY FUNDING GROUP, is a Connecticut limited liability company with its principal place of business at 99 Wall St, New York, NY 10005.

25.     Defendant MCA RECEIVABLES, LLC ("MCA Receivables" or "Ally") conducts its fraudulent business through multiple aliases, such as Ally Funding Group or United Fund USA.

26.     Despite doing business in New York, Defendant MCA Receivables does not appear licensed to do so, as it does not appear in the New York Department of State Division of Corporations database.

27.     Upon information and belief, Defendant YISROEL C. GETTER is a principal of Defendant MCA, with a business address at 99 Wall St, New York, NY 10005.

28.     Upon information and belief, Defendant Getter is a 23-year-old who began working in the MCA field in 2020, working with the notorious Jonathan Braun, a convicted felon who spent several years in jail for drug trafficking, and who has since orchestrated fraudulent MCA schemes as discussed and reported by Bloomberg News.  *See Haymount Urgent Care PC v. GoFund Advance, LLC*, 22-cv-1245 (S.D.N.Y.) (JSR).

29.     Upon information and belief, Getter has been involved in multiple MCA schemes involving several shell entities including GoFund Advance, LLC, Funding 123, LLC, Merchant Capital, LLC, and Alpha Recovery Partners, LLC.  *See Haymount Urgent Care PC v. GoFund Advance, LLC*, 22-cv-1245 (S.D.N.Y.) (JSR).

30.     Mr. Getter regularly uses the Connecticut State Court system to take advantage of vulnerable victims like Plaintiffs.  *See Haymount Urgent Care PC v. GoFund Advance, LLC*, 22-cv-1245 (S.D.N.Y.) (JSR).

31.     Upon information and belief Defendant MARTIN MILLER is either a broker for and/or an employee of Defendant MCA.

32.     It is suspected, but unknown whether this name is an alias.

33.     As described herein, Mr. Miller aided and abetted the other Defendants in their fraud.

34.     Defendant PARAGON CAPITAL SOURCE, LLC is allegedly a limited liability company with an address at 180 Water Street, New York, NY 10038.

35.     However, that address is a residential address, PARAGON's website is nonfunctional, PARAGON does not appear in any Google searches, PARAGON does not appear in a LexisNexis database search, and PARAGON does not seem to be registered in any state database.

36.     Accordingly, upon information and belief, PARAGON is a nonexistent entity used by Defendants MCA and GETTER in perpetuation of their fraudulent scheme, as described herein.

37.     Defendant THE WOODS LAW FIRM, LLC ("WOODS") is a Connecticut limited liability company with a business address of 360 Bloomfield, Suite 301, Windsor, Connecticut 06095.

38.     Defendant WOODS aids and abets the other defendants in their fraudulent scheme as discussed herein.

39.     Defendants John Does 1-10 are additional principals of MCA and/or PARAGON, whose identities are at this time unknown to Plaintiffs, but who are full participants in the fraudulent criminal enterprises discussed herein.

40.     Defendants John Doe Investors 1-10 are individuals and organizations whose identities are at this time unknown to Plaintiffs, but who knowingly fund, assist, and profit from the fraudulent criminal enterprise discussed herein, with full knowledge of the nature of the activity in which the enterprises are engaged.

## JURISDICTION

41.    Each Defendant is subject to the personal jurisdiction of this Court because each Defendant regularly transacts business within the State of New York, has purposefully availed itself of the laws of New York for the specific transactions at issue, or has selected New York as the forum for all disputes related to the transactions.

42.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), because (i) Plaintiff and Defendants are citizens of different states, and (ii) the amount in controversy exceeds $75,000 exclusive of interest and costs.

43.    This Court additionally has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961–68 ("RICO").

44.    This Court additionally has subject-matter jurisdiction over this dispute pursuant to 18 U.S.C. § 1030 based on Plaintiffs' claims for violation of The Computer Fraud and Abuse Act ("CFAA").

45.    The Court has subject-matter jurisdiction over Plaintiffs' state-law claims because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

46.    This Court also has jurisdiction under 28 U.S.C. § 2201 *et. seq.*

47.    Venue is proper because each Defendant regularly conducts business within this judicial district.

## COMMON FACTUAL ALLEGATIONS

### A.    The Predatory MCA Industry.

48.    The MCA Industry spawned from the 2008 Financial Crisis. One of the earliest

MCA companies, Yellowstone Capital LLC, was co-founded in 2009 by David Glass, an inspirational character for the movie "Boiler Room."[2] As Mr. Glass confessed to Bloomberg News, "it's a lot easier to persuade someone to take money than to spend it buying stock." Just like in the movie, MCA companies utilize high-pressure boiler room tactics, employing salespersons with absolutely no financial background whatsoever.

49.    As Bloomberg previously reported, the MCA Industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[3] The MCA Industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy." *Id.* As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage. There's no license you need to file for. It's pretty much unregulated." *Id.*

### B.    The Sham.

50.    Many states, like New York, have laws prohibiting the predatory interest rates. In order to evade these criminal usury laws, MCA companies disguise their agreements as "purchases of future receivables." MCA companies promote a fiction that, rather than making loans to merchants, they are purchasing, at a discount, a fixed amount of the merchant's future receivables, usually to be repaid through a fixed daily or weekly payment that purportedly represents a percentage of the merchant's receipts. The form of the contract thus allows MCAs to represent to courts that they, not the merchants, assume the risk that the merchants will fail to generate receivables. But the picture they paint is contrary to reality. By operation of their agreements' default rights and remedies, the MCA companies exert complete control over the

---

[2] https://www.sec.gov/litigation/admin/2008/34-58574.pdf
[3] https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans

relationship and compel their merchants to make the fixed payments or suffer the consequences.

### C. The Bloomberg Awakening.

51.     For nearly a decade, MCAs operated under the radar of regulators, compiling over 25,000 confessions of judgment against small businesses and their individual owners. That all changed on November 20, 2018 when Bloomberg News and renowned journalist Bethany McLean published what would be the first in a series of groundbreaking news articles exposing the abuses of the predatory MCA industry.[4]

52.     As a direct result of the light shined on these abuses, the New York Legislature quickly enacted legislation extinguishing their weapon of mass destruction, the confession of judgment, expressly citing the Bloomberg articles as its inspiration.

53.     Congress also took notice. On June 26, 2019, the United States House of Representatives held a hearing titled: "Crushed by Confessions of Judgment: the Small Business Story." As explained by Professor Hosea Harvey, a contracts expert from Temple University, small businesses are just as susceptible to predatory lending as unsophisticated individuals.[5]

54.     Regulators have also taken action. On July 31, 2020, the New York Attorney General brought suit against a group of MCA companies, as well as their principals, alleging that their MCA agreements constitute criminally usurious loans.[6]

55.     On July 31, 2020, the Securities and Exchange Commission shut down an MCA company. In its complaint, the SEC alleged that Par Funding "made opportunistic loans, some of which charged more than 400% interest, to small businesses across America."[7] The FBI

---

[4] https://www.yahoo.com/entertainment/merchant-cash-advances-salvation-small-businesses-payday-lending-reincarnate-161835117.html
[5] https://www.congress.gov/event/116th-congress/house-event/LC64251/text?s=1&r=60
[6] https://ag.ny.gov/press-release/2020/attorney-general-james-sues-predatory-lender-threatened-violence-and-kidnapping
[7] https://www.sec.gov/litigation/litreleases/2020/lr24860.htm

thereafter raided its offices, confiscating a cache of guns, millions of dollars in cash, and a private airplane.[8]

56.    On June 10, 2020, the Federal Trade Commission filed a complaint against John Braun and his various companies alleging various fraudulent and deceptive practices in connection with MCAs. *See* Ex. 6.[9]

57.    On August 3, 2020, the Federal Trade Commission filed a complaint against Yellowstone.[10] Notably, the FTC complained that Yellowstone "unlawfully withdrew millions of dollars in excess payments from their customers' accounts, and to the extent they provided refunds, sometimes took weeks or even months to provide them." *Id.*

58.    On November 10, 2020, the California Commission of Financial Protection and Innovation entered into a Consent Order with Allup Financial LLC, finding that its MCA agreements were lending transactions subject to the California Finance Lenders Law, and barring the MCA company from doing business in California unless and until it complies with its laws.[11]

59.    On December 8, 2020, the New Jersey Attorney General also filed suit against Yellowstone, alleging it cheated "financially-strapped small businesses and their owners out of millions of dollars nationwide by luring them into predatory loans disguised as cash advances on future receivables with interest rates far exceeding the interest rate caps in the State's usury laws."[12]

60.    On December 23, 2020, New York signed into law the Small Business Truth in

---

[8] https://www.inquirer.com/news/par-funding-better-financial-plan-joseph-laforte-dean-vagnozzi-20200731.html
[9] https://www.ftc.gov/system/files/documents/cases/192_3252_rcg_advances_-_complaint.pdf
[10] https://www.ftc.gov/news-events/press-releases/2020/08/ftc-alleges-merchant-cash-advance-provider-overcharged-small
[11] https://dfpi.ca.gov/wp-content/uploads/sites/337/2020/11/Consent-Order-Allup-Finance-LLC.pdf
[12] https://www.njoag.gov/ag-grewal-files-suit-against-yellowstone-capital-llc-and-associated-companies-alleging-the-merchant-cash-advance-companies-targeted-small-businesses-with-predatory-lending-and-abusive-collection-pract/

Lending Law, which is aimed at "protecting small business owners," and "requires key financial terms such as the amount financed, fees and annual percentage rate (APR) to be disclosed at the time a credit provider or broker makes an offer of financing of $500,000 or less."[13]

61.    As Gretchen Morgensen of NBC News recently reported, however, the financial greed of predatory lenders, like Defendants, has only accelerated in the wake of Covid-19.[14]

**D.    The Sea Change in Law.**

62.    Prior to the Bloomberg Awakening, courts routinely rejected attempts by small business victims seeking to vacate the many thousands of confessions of judgments filed by MCA companies. Courts primarily denied those attempts on the procedural basis that a plenary action must be filed instead of merely seeking to vacate by motion. One court went so far as to sanction the attorney for even bringing the motion. *See, e.g., Yellowstone Capital LLC v. Central USA Wireless LLC*, 2018 N.Y. Misc. LEXIS 2516, *2 (N.Y. Sup. Ct., Erie Cty Jun. 25, 2018) (citing *Yellowstone Capital, LLC v. Jevin*, Index No. 802457/2017 (N.Y. Sup. Ct. Erie Co. Oct. 6, 2017)).

63.    The tide has since turned in the wake of the Bloomberg articles. Most notable is the decision by Judge Nowak, a Commercial Division Justice out of Erie County—a favorite forum for MCAs given Upstate New York's more conservative political leanings. *See McNider Mar., LLC v Yellowstone Capital, LLC*, 2019 N.Y. Misc. LEXIS 6165 (N.Y. Sup. Ct., Erie Cty Nov. 19, 2019). Notably, Judge Nowak reversed his own prior decision in *Yellowstone Capital, LLC v. Jevin*, *supra*, where he previously held that the very same Yellowstone agreement was not a loan as a matter of law. This time, upon further reflection, Judge Nowak not only upheld

---

[13] https://www.jdsupra.com/legalnews/gov-cuomo-signs-new-york-small-business-9450503/
[14] https://www.nbcnews.com/business/economy/feds-crack-down-lenders-targeting-small-businesses-high-interest-loans-n1236167

the claims of usury, but also upheld the RICO claims. Numerous courts have followed suit. *See, e.g., Davis v. Richmond Capital Group*, 194 A.D.3d 516 (1st Dept. 2021); *NRO Boston LLC v. Yellowstone Capital LLC*, 2021 N.Y. Misc. LEXIS 1892 (Rockland Cty, April 9, 2021) (upholding RICO claims); *LG Funding LLC v. United Senior Properties of Olathe LLC,* 122 N.Y.S.3d 309 (2d Dep't. 2020); *American Resources Corp. v. C6 Capital, LLC*, 2020 N.Y. Misc. LEXIS 10725, *6 (N.Y. Sup. Ct., Kings Cty. Dec. 16, 2020); *Funding Metrics LLC v. NRO Boston*, 2019 N.Y. Misc. LEXIS 4878 (N.Y. Sup. Westch. Cty. Aug. 28, 2019); *Funding Metrics, LLC v. D & V Hospitality*, 62 Misc.3d 966 (N.Y. Sup. Westch. Cty. Jan. 7, 2019), *rev'd on other grounds*.

64.    Numerous federal courts, including this Court, have also joined the revolution. *See Lateral Recovery LLC v. Queen Funding LLC*, Case No. 21-civ-9607 22, 2022 U.S. Dist. 129032 (S.D.N.Y. July 20, 2022) (upholding RICO claims under MCA agreement); *Fleetwood Servs. LLC v. Ram Capital Funding, LLC*, Case No. 20-cv-5120 (LJL), 2022 U.S. Dist. LEXIS 100837 at *32 (S.D.N.Y. June 6, 2022) (applying risk-transfer analysis to an MCA agreement to conclude agreement was a criminally usurious loan in granting summary judgment on merchant's unlawful debt RICO collection claims); *Haymount Urgent Care PC v. GoFund Advance, LLC*, 22-cv-1245 (JSR), 2022 WL 2297768, *16 (S.D.N.Y. June 27, 2022) (same); *Fleetwood Servs., LLC v. Complete Bus. Sols. Grp.*, 374 F.Supp.3d 361 (E.D. Pa. 2019) (same); *NRO Boston v. Funding Metrics*, 2018 U.S. Dist. LEXIS 239152 (E.D. Pa. May 23, 2018) (same); *Davis v. Richmond Capital Group*, 194 A.D.3d 516 (1st Dept. 2021); *NRO Boston LLC v. Yellowstone Capital LLC*, 2021 N.Y. Misc. LEXIS 1892 (Rockland Cty, April 9, 2021) (upholding RICO claims).

65.    So has New York's highest court. Most notably, a member of New York's highest court, just recently advised in *dicta* that MCA transactions, like here, more closely resemble

loans subject to New York's usury laws rather than bona fide sales of receivables:

> Although the GTR and CMS agreements are described as 'factoring' agreements, they do not bear several of the hallmarks of traditional factoring arrangements, in that FutureNet did not sell any identifiable receivable to GTR or CMS; GTR and CMS did not collect any receivables; GTR and CMS received fixed daily withdrawals from FutureNet's bank account regardless of whether or how much FutureNet collected from or billed to its clients; and GTR and CMS did not bear the risk of nonpayment by any specific customer of FutureNet. The arrangements FutureNet entered with GTR and CMS appear less like factoring agreements and more like high- interest loans that might trigger usury concerns (*see Adar Bays, LLC v GeneSYS ID*, NE3d, 2021 NY Slip Op 05616 [2021]). Nevertheless, for the purpose of these certified questions, we are asked to assume the judgments rendered on those agreements are valid.

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 2021 N.Y. LEXIS 2577, *45, 2021 NY Slip Op 07055, 11, 2021 WL 5926893 (N.Y. Dec. 16, 2021).

### E.    The MCA Agreement is Substantively and Procedurally Unconscionable.

66.    The MCA Agreement is an unconscionable contract of adhesion that is not negotiated at arms-length.

67.    Instead, the MCA Agreement contains one-sided terms that prey upon the desperation of the small business and their individual owners and help conceal the fact that each of the transactions, including those involving the Plaintiffs, are really loans.

68.    Among these one-sided terms, the MCA Agreement includes: (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, (3) moving or selling the business or any assets without permission from the MCA company, (4) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (5) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of

which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition of obtaining financing from other sources, (11) the maintenance of business interruption insurance, (12) an assignment of lease of merchant's premises in favor of the MCA company, (13) the right to direct all credit card processing payments to the MCA company, (14) a power-of-attorney to settle all obligations due to the MCA Company and (15) a power of attorney authorizing the MCA company to "file any claims or taken any action or institute any proceeding…"

69. The MCA Agreement is also unconscionable because it contains numerous knowingly false statements. Among these knowingly false statements are that: (1) the transaction is not a loan, (2) the daily payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the MCA company to charge an exorbitant ACH Program Fee or Origination Fee.

70. The MCA Agreement is also unconscionable because it is designed to fail. Among other things, the MCA Agreement is designed to result in a default in the event that the merchant's business suffers any downturn in sales by preventing the merchant from obtaining other financing and requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant.

71. The MCA Agreement also contains numerous improper penalties that violate New York's strong public policy. Among these improper penalties, the MCA Agreement (1) entitles the MCA company to attorneys' fees, (2) accelerates the entire debt upon an Event of Default, and (3) requires the merchant to turn over 100% of all of its receivables if it misses just one fixed

daily payment.

72.    The Daily Payment under the MCA Agreement described below was fixed and absolute and the agreement's reconciliation provision was a sham.

73.    Defendants did not maintain reconciliation departments and did not have any one trained or otherwise dedicated to performing any reconciliation of a merchant's accounts. Indeed, the MCA Agreement did not contain any functioning contact information whereby Plaintiffs could even request a reconciliation within the terms of that provision.

74.    The terms of the reconciliation provisions further reveal the sham.

**F.    The Enterprise Intentionally Disguises the True Nature of the Transactions.**

75.    Despite the documented form, the transactions are, in economic reality, loans that are absolutely repayable. Among other hallmarks of a loan:

(a)    The Daily Payments are fixed and the so-called reconciliation provision are mere subterfuge to avoid this state's usury laws. Rather, just like any other loan, the Purchased Amount is to be repaid within a specified time;

(b)    The default and remedy provisions purport to hold the merchants absolutely liable for repayment of the Purchased Amount. The loans seek to obligate the merchants to ensure sufficient funds are maintained in the Account to make the Daily/Weekly Payments and, after a certain number of instances of insufficient funds being maintained in the Account, the merchants are in default and, upon default, the outstanding balance of the Purchased Amount becomes immediately due and owing;

(c)    While the agreements purport to "assign" all of the merchant's future account receivables to the Enterprise until the Purchased Amount is paid, the merchants retain all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof. Indeed, rather than purchasing receivables, the Enterprise merely acquires a security interest in the merchant's accounts to secure payment of the Purchased Amount;

(d)    The transactions are underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)    The Purchased Amount is not calculated based upon the fair market value of the merchant's future receivables, but rather is unilaterally dictated by the Enterprise based upon the interest rate it wants to be paid. Indeed, as part of the

underwriting process, the Enterprise does not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f)     The amount of the Daily Payments is determined based upon when the Enterprise wants to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g)     The Enterprise assumes no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constitutes a default under the agreements;

(h)     The Enterprise requires that the merchants undertake certain affirmative obligations and make certain representations and warranties that are aimed at ensuring the company will continue to operate and generate receivables and a breach of such obligations, representations and warranties constitutes a default, which fully protects the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

(i)     The Enterprise requires that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew would be breached from day one.

## FACTS SPECIFIC TO PLAINTIFFS

### A.    Christine D. Collins, PC

76.     Plaintiff Christine D. Collins, PC ("PC") is a private practice medical office that is an essential services provider of women's health services in the Los Angeles, California area.

77.     Plaintiff Christine Collins is a medical doctor and the principal of the PC.

78.     On or about September 19, 2022, Plaintiffs received a call from Defendant Miller, who represented himself as being a broker for Ally Funding.

79.     Defendant Miller represented that there was an offer for the business of a short-term loan of $250,000.

80.     Thereafter, Defendant Miller put Plaintiffs on a three-way call with himself and an alleged funder of the loan.

81.     Defendant Miller represented to Plaintiffs that the loan would carry 20% interest

and could be paid back in no less than 6 months through monthly payments, and that there would be a processing fee of $1,000 and an underwriting fee of $1,000.

82.    Plaintiffs agreed to enter into the loan on those terms.

83.    However, when Plaintiffs received the documentation, the amounts seemed different than had been discussed and agreed.

84.    Plaintiffs called up Mr. Miller, who informed that this was the standard documentation that had to be entered into, and once the loan was funded, the contract would be redrawn to reflect the numbers that they had discussed, and that Plaintiff would only have to pay back $5,000 every two weeks.

85.    Accordingly, on that basis, Plaintiffs signed the agreement on or about September 23, 2022.

86.    On its face, the agreement provided Plaintiffs an advance of $250,000.00 ("Purchase Price") in exchange for the purported purchase of all of Plaintiff's future receipts (the "Future Receipts") until such time as the amount of $349,750.00 (the "Purchased Amount") was repaid.

87.    On its face, the agreement provided that the Purchased Amount was to be repaid through daily ACH withdrawal in the amount of $7,500 (a "Daily Payment"), which would result in the amount being repaid in just 47 days which, on its face, translates to an annual interest rate of more than 310% per annum or more than 12 times the maximum 25% rate permitted under New York Penal Law.

88.    The fixed daily payment was disguised as a "good-faith estimate" equal to 39% of the PC's daily revenues. The estimated daily payment did not remotely reflect 39% of the PC's daily revenues. Rather, the estimated daily amount was dictated by Ally based on the length of

the payment term of the loan.

89.     On September 29, 2022, Plaintiffs received a wire from Defendant Ally, but it was only for $178,500.

90.     Additionally, $7,500 had been withdrawn immediately that same day.

91.     (At a loan of only $178,500, the interest was in fact $171,250, or 95% of the loan, which would translate to an annual interest rate of more than 737% for the year, or more than 29 times New York's criminal usury rate.)

92.     Plaintiffs called up Mr. Miller and stated that that was not was had been discussed or agreed.

93.     Mr. Miller stated that he would investigate and get back to Plaintiffs in about 5 minutes.

94.     However, Mr. Miller never returned the call.

95.     Getting a sinking feeling that she was being scammed, Christine when to her Chase branch and asked to put a stop payment on any attempted withdrawals by Defendant Ally, and she also moved her money to a different bank account at Bank of America.

96.     Thereafter, on Monday, October 3, Christine received another agreement from Mr. Miller and his partner "Brandon,"[15] for a loan from Defendant Paragon for $875,000 at 17% interest to be paid back over 60 days, in order to make up for the first loan.

97.     Plaintiffs refused, stating that they did not want to borrow so much money and wanted to just finish up with the first loan and the terms that had been agreed to.

98.     Mr. Miller and Brandon stated that they would work on modifying the first agreement to reflect the terms agreed to, and that they would get back to Plaintiffs the next day.

---

[15] Because "Brandon's" name is unknown at this time, Brandon is included in the John Doe defendants, and Plaintiffs will move to amend the complaint to add Brandon at the appropriate time.

99.    Plaintiffs did not hear back from them, however.

100.    On October 6, Plaintiff was shocked to discover that nearly $400,000 had been withdrawn from the PC's Bank of America account.

101.    As she was informed by her bank, apparently, on October 4, Defendants had served Bank of America with a "legal order" signed by Defendant Woods attaching and asserting a lien against the PC's bank account for $392,250.

102.    In order to get the amount so high, Defendant Woods submitted papers attesting that there was an anticipated $50,000 in legal fees, an exorbitant number with no relation whatsoever to reality.

103.    In fact, in the other actions in which MCA Receivables and Getter have prosecuted in Connecticut, there is usually a junior associate who comes in at the end of the case and files an affirmation of fees for $1,000-$2,000.

104.    Accordingly, Woods and Defendant Getter, who also signed the document, knew that this quoted amount was fraudulent, but nonetheless listed it so that they could freeze an even larger amount of Plaintiffs' money and attempt to extort that higher amount from Plaintiff.

105.    Plaintiffs had received no notice whatsoever before this money was withdrawn from the PC's account.

106.    Apparently, Defendant MCA Receivables had utilized the Connecticut loophole exposed by Bloomberg News, and levied the PC's assets in California (despite the fact that the Connecticut loophole only applies to assets in Connecticut) with nothing more than the signature of MCA's attorney, Defendant Woods.

107.    Moreover, upon information and belief, Defendants had accessed Plaintiffs' Chase bank account in order to discover that Plaintiff had moved the funds to Bank of America.

108.    Thereafter, Plaintiffs received two calls from Getter and/or "Brandon" stating that the account had been frozen by Ally, and that the only way to get the account released was to sign an agreement agreeing to allow Ally to take the $392,250 and waiving and releasing any claims, and that once that was done, Defendant Paragon would release the $850,000 to Plaintiffs minus their $40,000 fee and minus the $179,500 that had been loaned by Ally, and that Brandon would then work with Paragon to renegotiate the terms to something more favorable for Plaintiffs.

109.    Plaintiffs refused.

110.    That was when Getter began making threats against Plaintiffs.

111.    Shortly thereafter, Plaintiff received the "settlement" and release from Woods.

112.    Thereafter, on October 17, Christine discovered that another ~$65,000 had been frozen in her personal account, utilizing the same method.

113.    Around the same time, she received another call from Miller offering a new loan from Defendant Paragon.

**H.    Fraudulent Scheme**.

114.    The Defendants have unlawfully provided usurious loans by way of the sham MCA Agreement.

115.    Defendants have engaged in predatory and fraudulent conduct that allowed them to fraudulently extract even more monies from Plaintiff.

116.    Among other things, Defendants fraudulently induced Plaintiffs to enter into contracts not reflecting the terms agreed upon; Defendants fraudulently charged Plaintiff tens of thousands of dollars in so-called "Origination Fees" and "Underwriting Fees" to cover the costs of due diligence that they never performed and "ACH fees" to cover ACH operations they

claimed were "labor intensive" but, in actuality, were fully automated and cost a mere fraction of the fees charged to Plaintiff; Defendants fraudulently claimed tens of thousands of dollars in anticipated attorney's fees that Defendants knew they would not incur in order to freeze and extort a larger amount of money; Defendants fraudulently accessed Plaintiffs' bank account in order to determine where Plaintiffs may have been holding other assets; Defendants fraudulently offered a second loan from a nonexistent entity in order to get Plaintiffs to agree to give Defendants nearly $400,000; and Defendants fraudulently attempted to extort Plaintiffs into signing a settlement and release.

### FIRST CAUSE OF ACTION
**(RICO: 18 U.S.C. § 1962)**

117.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**A.    The Unlawful Activity.**

118.    More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

119.    In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

120.    As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp*., 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

121.     As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

122.     This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

123.     As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

124.     The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

125.     Like here, this was a purely artificial device used by the loan-shark to evade the law—an evasion that the Legislature sought to prevent.

126.     Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

**B.      Culpable Persons.**

127.     Getter, Miller, and Woods are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is an individual capable of holding a legal interest in property.

128.     Upon information and belief, Getter is the owner of MCA Receivables, which has less than ten (10) employees.

129.     Upon information and belief, Getter is also the owner of Defendant Paragon (should it even exist), which has less than ten (10) employees.

**C.      The Enterprise.**

130.     Defendants Getter, Miller, Woods, John Does 1-10, MCA Receivables, Paragon,

and their Defendant John Doe Investors 1-10 constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

131.    The Enterprise is associated in fact for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Enterprise has a goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at many multiples above the enforceable rate under the laws of New York and other states.

132.    Since at least 2022 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

133.    The debt, including such debt evidenced by the agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are many multiples higher than the legal rate permitted under New York Penal Law §190.40.

134.    The members of each Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

135.    The Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

136.    The members of each Enterprise have had ongoing relations with each other

through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of transporting fraudulently-obtained money interstate.

137.    The Enterprise's conduct constitutes interstate transportation of stolen property within the meaning of 18 U.S.C. 2314, which is "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

> **D.    The Roles of the RICO Persons in Operating the Enterprise, and the roles of the individual companies within the Enterprise.**

138.    The RICO Persons have organized themselves and each Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

139.    Upon information and belief, Getter is the principal of the Enterprise. He is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

140.    In his capacity as principal, Getter is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of

collecting the daily payments via ACH withdrawals; and (iii) the method and form used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations. All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to Plaintiffs.

141.    Getter has taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of each Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

142.    Upon information and belief, Miller and "Brandon" are brokers/salespersons who fraudulently induce victims like Plaintiff into signing the unlawful MCA agreements with Defendant Ally, presumably for a commission.

143.    Upon information and belief, Woods is the attorney that Ally and Getter use to unlawfully freeze and levy against victims' bank account, fraudulently induce to sign "settlement" agreements and releases, and collect upon the unlawful loans.

144.    Upon information and belief, Paragon is a fake entity that Defendants Getter and Miller use to defraud victims into taking out further loans or "settling with" and releasing Defendants.

145.    All of the individual Defendants have ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the other Enterprise members.

146.    Getter has operated Ally together with the related Enterprise companies as part of an unlawful enterprise to collect upon unlawful debt, commit wire fraud, and cause the interstate transportation of money obtained through fraud. Pursuant to its membership in the Enterprise,

Ally has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtained judgments in its name to further collect upon the unlawful debt.

147.    The Investors are a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of the other Enterprise Members.

148.    Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing Ally with all or a portion of the pooled funds necessary to fund the usurious loans, including the Agreement, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

149.    The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

150.    In this case, Ally, through the respective individual Defendants: (i) solicited borrowers; (ii) pooled funds from Investors to fund the agreements; (iii) underwrote the agreements; (iv) entered into the agreements; and (v) collected upon the unlawful debt evidenced by the agreements by effecting wire transfers from the bank accounts of Plaintiffs.

### E.    Interstate Commerce

151.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

152.    Specifically, members of each Enterprise maintain offices in New York and Connecticut and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in California, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

153.    In the present case, all communications between the members of the Enterprise were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the agreements, fund the advances under each of the agreements and collect the payments via interstate electronic ACH debits.

154.    In addition, at the direction of the respective Defendants, agreements were executed in states outside of New York, and original copies of the Agreements were sent to each Enterprise, through Defendants, at their offices in New York via electronic mail.

### F.    Injury and Causation.

155.    Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial, but no less than $451,000.

156.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, thousands of dollars in improperly collected criminally usurious loan payments, defaulted

loans, and repossessed property. Plaintiffs were forced to make daily payments pursuant to the MCA Agreement that amounted to unconscionable interest rates.

157.     Under controlling New York law, the MCA Agreement is void *ab initio*. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 2021 WL 4777289 (N.Y. Oct. 14, 2021).

158.     Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

159.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

## SECOND CAUSE OF ACTION
### (Conspiracy under 18 U.S.C. § 1962(d))

160.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

161.     Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed with members of each Enterprise to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

162.     By and through the Enterprise Members' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants and the Enterprise Members concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreement, the respective Defendants knew the nature of the Enterprise and Defendants knew that the Enterprise extended beyond each Enterprise Member's individual role. Moreover, through the same connections and coordination, Defendants knew that the other Enterprise Members were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

163.     The respective Defendants each agreed to facilitate, conduct, and participate in

the conduct, management, or operation of the Enterprise's affairs in order to collect upon

unlawful debts, including the Agreement, in violation of 18 U.S.C. § 1962(c). In particular, each

Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and

each of the Enterprise Members shared a common purpose, namely, the orchestration, planning,

preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful

debts, including the Agreement.

164.    The respective Defendants agreed to facilitate, conduct, and participate in the

conduct, management, or operation of each Enterprise's affairs in order to commit wire fraud

through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

165.    The respective Defendants also agreed to facilitate, conduct, and participate in

the conduct, management, or operation of each Enterprise's affairs in order to commit the

interstate transportation of money obtained by fraud in violation of 18 U.S.C. §2314.

166.    The participation and agreement of the respective Defendants and each

Enterprise Member was necessary to allow the commission of this scheme.

167.    Plaintiffs have been and will continue to be injured in their business and

property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be

determined at trial but no less than $451,000.

168.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably

resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to,

improperly collected loan payments, lost patients, loss of business and goodwill, and lost profits.

169.    Plaintiffs were forced to make daily payments pursuant to the MCA agreements

that amounted to unconscionable interest rates.

170.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs

associated with exposing and prosecuting Defendants' criminal activities.

171.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus

costs and attorneys' fees from the Defendants.

### THIRD CAUSE OF ACTION
### (Declaratory Relief)

172.    Plaintiffs repeat and hereby incorporate each of the above allegation.

173.    Under controlling New York law, the MCA Agreements are void *ab initio*. *See*

*Adar Bays, LLC v. GeneSYS ID, Inc.*, 2021 LEXIS 2206, 2021 Slip Op. 05616, 2021 WL

4777289 (N.Y. Oct. 14, 2021).

174.    A declaratory judgment is required by this Court to determine the rights and

obligations of the parties with respect to the MCA Agreement, which is void as a matter of law,

and declaring that the Defendants have no right to enforce any security rights and that

Defendants are barred from enforcing unconscionable and illegal interest rates on sham loans.

### FOURTH CAUSE OF ACTION
### (Fraud)

175.    Plaintiffs repeat and re-allege each of the above allegations.

176.    Defendants fraudulently induced Plaintiffs to enter into the MCA agreement at

issue by misrepresenting the amount and term of the loan and that there would be a subsequent

contract, as discussed above.

177.    Moreover, upon information and belief, Defendants charged Plaintiffs $71,500 in

sham fees relating to the loan, which Defendants fraudulently charged and converted.

178.    Upon information and belief, the Defendants improperly deducted an "Origination

Fee" to cover cost of origination and ACH Setup. This fee was fraudulent as it was simply a ploy to extract additional funds from the Plaintiffs and did not actually comprise of related expenses pertaining to origination. None of these fees had any relationship to any services actually rendered and instead were disguised interest charges.

179.    Upon information and belief, the Defendants also deducted an Underwriting Fee for underwriting and related expense. This fee was fraudulent as this was simply a sham to extract more funds from the Plaintiffs. None of these fees had any relationship to any services actually rendered and instead were disguised interest charges.

180.    Defendants also deducted additional sham fees as set forth in the MCA Agreement which were similarly a fraudulent ploy to extract funds from the Plaintiffs by using a sham misnomer characterization of fees.

181.    The MCA Agreement represented that these fees were for services or costs purportedly provided by or incurred by Ally in connection with its agreement, but, in reality, these services or costs were never provided or incurred or were otherwise provided or incurred for amounts far below those stated in the MCA agreement and the so-called "fees" were nothing more than additional profits reaped by Ally under the MCA agreement.

182.     For example, the MCA Agreement provided for an "Underwriting Fee" in order "to cover Underwriting and related expenses." However, Ally performed little or no due diligence and conducted very little underwriting when entering into the MCA Agreement.

183.    Ally required little more than the completion of an online application and a few months of bank statements and approved the loan to Plaintiffs in a matter of hours.

184.    Ally knew that its representations concerning the nature and purpose of the various fees were false and misleading at the time it entered into the MCA Agreement.

185.    These false representations were made in order to induce Plaintiffs into believing that the fees charged to Plaintiffs and deducted from the Purchased Amount of the MCA Agreement were legitimate fees charged to offset the costs of services provided by Ally under the MCA Agreement.

186.    Plaintiffs reasonably relied upon Ally's (mis)representations in entering into the MCA Agreement.

187.    Additionally, Defendant Woods participated in the fraud by filing false papers in Connecticut asserting grossly inflated anticipated attorney's fees in order to freeze and extort a larger sum from Plaintiffs.

188.    The respective Defendants have demonstrated a fraudulent scheme. By reason of the foregoing, Plaintiffs are entitled to a judgment against each of Defendants in an amount to be determined at trial.


## FIFTH CAUSE OF ACTION
### (In the alternative, Breach of Contract)

189.    Plaintiffs repeat and re-allege each of the above allegations.

190.    Under the MCA Agreement, Defendants promised to advance certain amounts.

191.    Defendants did not advance the amounts as promised.

192.    As a direct and proximate result of Defendants' breach of the MCA Agreement, and subsequent actions in levying against Plaintiffs' bank accounts, Plaintiffs have been damaged in the amounts described in detail above.

193.    In the event that the Court finds that the MCA Agreement is valid and enforceable and not void *ab initio* as a matter of law, then Plaintiffs are entitled to direct and consequential damages caused by Defendants' breach of the MCA Agreement.

**SIXTH CAUSE OF ACTION**
**(42 U.S.C. § 1983)**

194.    Plaintiffs repeat and re-allege each of the above allegations.

195.    In response to New York's prohibition against using its confession of judgment statute and related judgment collection procedures against out-of-state residents, Defendants knowingly and purposely devised a scheme to deprive out-of-state residents from their constitutional right to due process under the Fourteenth Amendment of the United States Constitution by abusing the state laws of Connecticut.

196.    In particular, Defendant Getter, who is located in and resides in Brooklyn, New York, devised a scheme where he would fraudulently use a Connecticut entity and/or contractual terms applying Connecticut law, and a Connecticut attorney in Defendant Woods, in order to avail Defendants of Connecticut's prejudgment attachment statute.

197.    The statute, Conn. Gen. Stat. § 52-278(f), is unconstitutional as used by Defendants.

198.    In their form, contracts of adhesion, Defendants require merchants, such as here, to consent to the jurisdiction of two different states, Connecticut and New York, even though Connecticut has nothing to do with the transaction or parties.

199.    In addition, Defendants include a form "Prejudgment Remedy Waiver," requiring merchants to waive "all rights to notice and prior court hearing or court order in connection with any and all prejudgment remedies…"

200.    Then, when the merchant fails to pay for any reason at all, even in the event of a good-faith dispute, such as here, Defendants employ the prejudgment attachment mechanism of § 52-278(f) by serving a Writ of Attachment on the merchant's bank account ***before the filing of***

*a complaint and before serving the merchant.*

201.    In order to utilize its prejudgment attachment remedies, § 52-278(f) provides: "(1)

*the complaint shall set forth a copy of the waiver*; (2) *the plaintiff shall file an affidavit* sworn

to by the plaintiff or any competent affiant setting forth a statement of facts sufficient to show

that there is probable cause that a judgment in the amount of the prejudgment remedy sought, or

in an amount greater than the amount of the prejudgment remedy sought, taking into account any

known defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff;

and (3) the *plaintiff shall include in the process served on the defendant a notice satisfying the*

*requirements of subsections (b) and (c) of section 52-278e*."

202.    These requirements are also plainly spelled out on the court's practice guide:

II.  **PJR When Defendant In Commercial Transaction Has Waived Notice And Hearing (Section 52-278f of the Connecticut General Statutes) - Documents Required**

Note: These documents must be served on the Defendant.  After service on the Defendant, these documents must be returned underlined electronically to the Court in accordance with the E-Services Procedures and Technical Standards.

    A.  A Notice of Ex Parte Prejudgment Remedy/Claim for Hearing to Dissolve or Modify (form **JD-CV 55**) may be used to meet the requirement of notice in **Section 52-278f of the Connecticut General Statutes**.

    B.  Signed complaint that includes a copy of the waiver

    C.  Affidavit by the plaintiff or another person who know the facts personally containing a statement of facts that show probable cause that a judgment in the amount of the prejudgment remedy being asked for, or in an amount greater than the amount of the prejudgment remedy being asked for after considering any known defenses, counterclaims, or set-offs, will be rendered in the matter for the plaintiff.

203.    Instead of complying with the letter and spirit of the protections afforded by § 52-

278(f), Defendants instead, like here, fire first and ask questions later.

204.    Specifically, Defendants *do not* (1) draft and serve a complaint providing notice

to the merchant of its claims; (2) rely upon an affidavit setting forth the facts sufficient to show

probably cause; or (3) provide notice to the merchants satisfying subsections (b) and (c) of

section 52-278e."

205.    Rather than comply with the dictates of § 52-278(f), Defendants first freeze the merchant's bank accounts by serving writs of attachment on the bank only, and then immediately demand a settlement under duress and the threat of financial ruin, and only then proceed to court if the extortion attempt fails.

206.    By abusing § 52-278(f), Defendants knowingly and intentionally deprive their merchants of their constitutional due process rights by freezing bank accounts and not even knowing how the bank account was frozen or where to go to seek protection.

207.    For example, here, Defendants froze the PC's California bank account by serving a writ of attachment on a Connecticut branch on or about October 4, 2022 and on or about October 17, 2022.

208.    No notice was provided by Defendants before, during or after the banks froze the account. Instead, Plaintiffs had to proactively reach out to their banks to understand what had occurred. Upon information and belief, the papers served on TD Bank did not include a copy of a complaint identifying the grounds for the claims asserted by Defendants.

209.    Plaintiffs did not voluntarily and intelligently waive their due process rights. *See D.H. Overmyer Co., Inc. v. Frick Co.*, 405 U.S. 174, 31 L. Ed. 2d 124, 92 S. Ct. 775 (1972).

210.    Rather, Plaintiffs (1) were not represented by legal counsel; (2) are unsophisticated business persons; (3) did not have any prior pending actions against them by Defendants; (4) did not have a fair balance of bargaining power; (5) did not negotiate the terms at arms-length; and (6) were knowingly and intentionally taken advantage of by Defendants due to their financial duress.

211.    Defendants knowingly and intentionally deprived Plaintiffs of their due process

rights and had no good-faith basis to believe their actions were lawful under the color of state law. *See Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250 (3d Cir. 1994).

212.    As a direct and proximate cause of Defendants' knowing and intentional violation of 42 U.S.C. § 1983, Plaintiffs suffered damages by, among other things, not being able to pay for their usual business expenses.

213.    By reason of the foregoing, Plaintiffs are entitled to a judgment against each of Defendants in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### (18 U.S.C. § 1030)

214.    Plaintiffs repeat and re-allege each of the above allegations.

215.    As part of the MCA Agreement, Plaintiffs were required to provide Ally with the login information for their bank account.

216.    The Agreement specifically provided that Ally would only log into the account in order to "verify the amount of the daily payment" and that Ally would "carefully safeguard [Plaintiffs'] confidential information, and only essential personnel will have access to it."

217.    However, Ally exceeded this authority.

218.    Upon information and belief, on or about October 3, 2022 and/or October 4, 2022, Defendants logged into the PC's bank account in order to try to determine what other financial institutions the PC used.

219.    Utilizing this information, the Defendants then shared this information with Defendant Woods, who utilized the Connecticut loophole described above to levy nearly $400,000 in the PC's Bank of America bank account.

220.    Defendants knowingly exceeded their authority and accessed the computer

records of a financial institution in order to further their intended fraud and obtains money in excess of $5,000.

221.    Defendants then used this information to freeze and levy against nearly $400,000 of Plaintiffs' money.

222.    Plaintiffs have suffered the damages as discussed above.

223.    Under 18 U.S.C. 1030(g), Plaintiffs are entitled to compensatory damages and injunctive relief or other equitable relief.

224.    By reason of the foregoing, Plaintiffs are entitled to a judgment against each of Defendants in an amount to be determined at trial.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, jointly and severally, and seek an order from the Court:

a)    Declaring that the Agreement entered into between Plaintiffs and Defendants constitute a loan transaction, and thus is void because it intended to charge and receive a criminally usurious interest rate in excess of 25%;

b)    Ordering Defendants to repay all principal and interest previously paid to Defendants in connection with the criminally usurious loans, including prejudgment interest;

c)    Granting an injunction against Defendants permanently enjoining them from enforcing any of their rights under the criminally usurious loans;

d)    Awarding the Plaintiffs direct and consequential damages in an amount to be proved at trial, but believed to be no less than $451,000;

e)    Awarding Plaintiffs treble damages;

f)    Awarding Plaintiffs their attorney's fees and costs incurred in this action; and

g)    Granting such other and further relief as this Court deems just and proper.

Dated: Fresh Meadows, New York
          January 13, 2023

_/s/ Jonathan E. Neuman_
JONATHAN E. NEUMAN, ESQ.
*Attorney for Plaintiffs*
176-25 Union Turnpike, Suite 230
Fresh Meadows, New York 11366
(347) 450-6710
(718) 228-3689 *facsimile*
jnesq@jenesqlaw.com