UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHRISTINE D. COLLINS, A PROFESSIONAL
CORPORATION and CHRISTINE DEANNE
COLLINS, individually,

                                    Plaintiffs,

                    -against-

MCA RECEIVABLES, LLC D/B/A ALLY
FUNDING TEMPORARY GROUP, YISROEL C.
GETTER; MARTIN MILLER; PARAGON
CAPITAL SOURCE, LLC; JOHN DOES 1-10; and
JOHN DOE INVESTORS 1-10,

                                    Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   01/23/2024  

23 Civ. 353 (AT)

**<u>ORDER</u>**

ANALISA TORRES, District Judge:

Plaintiffs—Christine D. Collins, a Professional Corporation, and Christine Deanne Collins—

filed this action against MCA Receivables, LLC d/b/a Ally Funding Group ("Ally"), Yisroel Getter,

and various others, bringing claims for declaratory relief, fraud, breach of contract, and violations of

the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*; the

Fourteenth Amendment; and the Computer Fraud and Abuse Act of 1986 (the "CFAA"), 18 U.S.C.

§ 1030.  Compl., ECF No. 1.  Ally and Getter (together, "Defendants") move to partially dismiss the

complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  ECF No.

49.  For the reasons stated below, the motion is GRANTED in part and DENIED in part.

## BACKGROUND

I.    <u>Factual Background</u>[1]

Ally is a Connecticut company that offers "merchant cash advances" ("MCAs"); Getter is its

principal.  Compl. ¶¶ 1, 24, 27.  The MCA industry is "essentially payday lending for small

---

[1] The following facts are taken from the complaint, which the Court accepts as true for purpose of this motion.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

businesses." *Id.* ¶ 49.[2]  An MCA is styled as a discounted purchase of a business's future receivables, "usually to be repaid through a fixed daily or weekly payment that purportedly represents a percentage of the merchant's receipts." *Id.* ¶ 50.  In exchange, the business receives an immediate cash infusion.  The industry has come under regulatory scrutiny for the high interest rates charged—some exceeding 500 percent per year—and the "high-pressure boiler room tactics" of its salespeople.  *Id.* ¶¶ 48–49.

Plaintiff Christine Collins is a California physician who owns and operates Christine D. Collins, PC (the "PC"), a women's health center in the Los Angeles area.  *Id.* ¶¶ 76–77.  On September 19, 2022, Plaintiffs received a call from Defendant Martin Miller, who said he was a broker for Ally.  *Id.* ¶ 78.  Miller offered Plaintiffs "a short-term loan of $250,000," representing "that the loan would carry 20% interest and could be paid back in no less than 6 months through monthly payments, and that there would be a processing fee of $1,000 and an underwriting fee of $1,000." *Id.* ¶¶ 79–81.  Plaintiffs agreed to enter into the MCA on those terms.  *Id.* ¶ 82.

When Plaintiffs received the paperwork, however, "the amounts seemed different than had been discussed and agreed." *Id.* ¶ 83.  Plaintiffs called Miller, who said that "this was the standard documentation that had to be entered into, and once the loan was funded, the contract would be redrawn to reflect the numbers that they had discussed." *Id.* ¶ 84.  Miller also stated that "Plaintiff would only have to pay back $5,000 every two weeks." *Id.*

Several days later, Collins signed the agreement (the "Agreement") as a guarantor on behalf of the PC.  *Id.* ¶ 85; *see* Agreement, ECF No. 5-3.[3]  The Agreement states that Ally is purchasing

---

[2] *See* Zeke Faux & Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, Bloomberg (Nov. 13, 2014), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

[3] Although the Agreement is not attached to the complaint, it is properly considered in connection with this motion because the complaint "relies heavily upon its terms and effect," rendering it "integral." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  A copy of the executed Agreement is annexed to Plaintiffs' motion for a temporary restraining order and preliminary injunction.  ECF No. 5-3.

$349,750.00 (the "Purchased Amount") of the PC's future receivables in exchange for $250,000 (the "Purchase Price").  Agreement at 1; Compl. ¶ 86.  Plaintiffs would repay the Purchased Amount through daily ACH bank withdrawals of $7,500.  Agreement at 1; Compl. ¶ 87.  The Agreement claims that the $7,500 figure is a "good faith estimate" of thirty-nine percent of Plaintiffs' daily revenues.  Agreement at 1; Compl. ¶ 88.  At that rate, Plaintiff would repay the Purchased Amount in forty-seven days, "which, on its face, translates to an annual interest rate of more than 310% per annum."  Compl. ¶ 87.

Appendix A of the Agreement, a fee schedule, provides that several "upfront fees" would be deducted from the Purchase Price before it was distributed to Plaintiffs.  One is an "Underwriting Fee," a "[m]inimum of $1,000.00 or up to 15% of the [P]urchase [P]rice for underwriting fees, broker fees and related expenses."  Agreement at 8.  Another is an "Origination Fee," also a "[m]inimum of $1,000.00 or up to 15% of the [P]urchase [P]rice to cover cost of Origination and ACH Setup." *Id.*

The Agreement also states that Ally "will require viewing access [] to your bank account, each business day, in order to verify the amount of your daily payment," as well as "prior to funding, as part of our underwriting process."  Agreement at 10.  Plaintiffs provided their bank login information. *Id.*

The Agreement provides Ally with various "protections against default," which "may be invoked by [Ally] immediately and without notice to" Plaintiffs should certain listed events occur—for example, if the PC "transfers, moves, sells, disposes, or otherwise conveys its business and/or assets" without Ally's written consent, or "changes its arrangements" with its bank "in any way that is adverse or unacceptable to [Ally]."  Agreement at 2–3.  If a listed event occurs, the Agreement permits Ally to collect the full Purchased Amount "plus all fees (including reasonable attorney's fees) . . . immediately." *Id.* at 3.  Ally may also "enforce the provisions of the Limited Personal Guarantee of Performance against" Collins, making her "jointly and several liable for all amounts owed to

[Ally]." *Id.* at 3, 6–7. Plus, Ally can "proceed to protect and enforce its right and remedies by lawsuit," and, if Ally recovers a judgment, the business "shall be liable for all of [Ally's] costs." *Id.*

The Agreement also includes a "prejudgment remedy waiver," which provides that Ally can use Connecticut's "confession of judgment" process to attach Plaintiffs' accounts and assets without a judicial hearing. It states, that "to the extent allowed under Connecticut General Statutes sections 52-278a to 52-278m, inclusive, or by other applicable law":

> [E]ach and every merchant and guarantor of this Agreement hereby waive (a) all rights to notice and prior court hearing or court order in connection with any and all prejudgment remedies to which [Ally] may become entitled by virtue of any default or provision of this Agreement or security agreement securing this Agreement and (b) all rights to request that [Ally] post a bond . . . .

*Id.* at 4–5. By signing the Agreement, Plaintiffs "consent[ed] that [Ally] may attach or garnish any and all of [their] money held in any bank account at any banking institution" with a branch or office located in Connecticut, or authorized to conduct business there. *Id.* at 5.

The Agreement also includes a security agreement granting Ally a lien on all of the PC's accounts, assets, funds, and other property (the "Collateral"). *Id.* at 6. Ally may exercise its security interest "without notice or demand or any kind by making an immediate withdrawal or freezing the Collateral." *Id.*

On September 29, 2022, a week after Collins signed the Agreement, Ally wired Plaintiffs $178,500 and withdrew $7,500 from the PC's Chase bank account. Compl. ¶¶ 89–90. Collins called Miller "and stated that this was not had been discussed or agreed." *Id.* ¶ 92. Miller said he would investigate "and get back to Plaintiffs in about 5 minutes," but "never returned the call." *Id.* ¶¶ 93–94. Wary "that she was being scammed," Collins instructed Chase to deny any attempted withdrawals by Ally, and "moved her money to a different bank account at Bank of America." *Id.* ¶ 95.

On October 6, 2022, Collins discovered that $392,250 had been withdrawn from the Bank of America account.  *Id.* ¶ 100.  Bank of America informed her that on October 4, 2022, Defendants had served it with a Connecticut legal order "attaching and asserting a lien against the [] bank account for $392,250," a sum which included "an anticipated $50,000 in legal fees."  *Id.* ¶¶ 101–02, 106.  Plaintiffs allege that Defendants accessed the Chase bank account in order to discover that Plaintiffs had moved funds to Bank of America.  *Id.* ¶ 107.

Getter "and/or 'Brandon,'" another purported Ally associate, called Collins and told her that Ally had frozen the bank account.  *Id.* ¶ 108.  They said "that the only way to get the account released was to sign an agreement . . . allow[ing] Ally to take the $392,250 and waiving and releasing any claims."  *Id.*  They also offered her another loan for $850,000.  *Id.*  Collins refused.  *Id.* ¶ 109.  On October 17, 2022, Collins discovered that another $65,000 had been frozen in her personal account.  *Id.* ¶ 112.

## II.   Procedural History

Plaintiffs filed this action on January 14, 2023, asserting seven claims: (1) RICO, based on collection of an unlawful debt, interstate transport of stolen property, and wire fraud; (2) racketeering conspiracy, based on an alleged conspiracy to commit the substantive RICO scheme; (3) declaratory judgment, seeking a declaration that the Agreement is void ab initio under New York law; (4) common law fraud, related to the imposition of excessive fees; (5) breach of contract, based on Defendants' alleged failure to advance promised amounts; (6) section 1983, related to allegedly abusive use of the Connecticut pre-judgment relief statute; and (7) violation of the CFAA, related to Defendants' alleged access to the PC's bank account.  *See* Compl. ¶¶ 117–224.  On February 14, 2023, the Court granted Plaintiffs' motion for a preliminary injunction, prohibiting Defendants from continuing to debit unauthorized funds from Plaintiffs' accounts and from freezing Plaintiffs' assets and receivables.  ECF Nos. 32, 44.

Defendants now move to dismiss Plaintiffs' claims for declaratory judgment, fraud, breach of contract, and violation of the CFAA.[4]  ECF No. 49; Def. Mem., ECF No. 50.

**LEGAL STANDARD**

To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions." *Twombly*, 550 U.S. at 555.  Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id*.  On a Rule 12(b)(6) motion, the court may consider only the complaint, documents attached to the complaint or incorporated in it by reference, matters of which a court can take judicial notice, or documents that the plaintiff knew about and relied upon in bringing the suit. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002).  The court must accept the allegations in the complaint as true and draw all reasonable inferences in the non-movant's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

Claims sounding in fraud are subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements.  To survive a motion to dismiss a fraud claim, the plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Emps.' Retirement Sys. of Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (citation omitted).

---

[4] Defendants do not challenge Plaintiffs' claims under RICO or section 1983.

**DISCUSSION**

## I.     Declaratory Judgment

In their third cause of action, Plaintiffs contend that they are entitled to a declaratory judgment stating that the Agreement is void ab initio as a criminally usurious loan under New York law. Compl. ¶¶ 172–74 (citing *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320 (2021)). Under state usury law, N.Y. General Obligations Law § 5-521, when the interest rate on a loan exceeds 25 percent—the criminal usury rate—"a corporation may interpose an affirmative defense of usury and, if successful, obtain a declaration that invalidates the debt instrument *ab initio*." *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 254 (S.D.N.Y. 2022).

The Court first addresses the question of which state's law to apply. The Agreement contains a choice-of-law clause specifying that it "shall be governed by and construed in accordance with the laws of the State [of] Connecticut." Agreement at 4. Whether a usury claim falls within such a contractual choice-of-law provision is an unsettled question in this Circuit. *See Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, No. 20 Civ. 5120, 2022 WL 1997207, at *16–18 (S.D.N.Y. June 6, 2022). Here, however, both parties appear to assume that—despite the choice-of-law provision— New York law applies. "Because the parties do not dispute that New York law applies to these claims, the Court assumes for the purposes of this motion that New York law governs." *Grain D'Or LLC v. Wizman*, No. 21 Civ. 10652, 2023 WL 5609101, at *11 (S.D.N.Y. Aug. 30, 2023); *see also Alphonse Hotel Corporation v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016) ("The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law"

(cleaned up)); *Fleisig v. ED&F Man Cap. Markets, Inc.*, No. 19 Civ. 8217, 2021 WL 2678675, at *8 (S.D.N.Y. June 30, 2021).[5]

"New York courts have uniformly construed [the state usury] statute as limited to the affirmative defense, and they have prohibited corporations from bringing affirmative claims or counterclaims alleging criminal usury and seeking to invalidate an agreement." *Streamlined Consultants, Inc. v. EBF Holdings LLC*, No. 21 Civ. 9528, 2022 WL 4368114, at *3 (S.D.N.Y. Sept. 20, 2022) (citing *Haymount*, 609 F. Supp. 3d at 254); *see also Paycation Travel, Inc. v. Glob. Merch. Cash, Inc.*, 141 N.Y.S.3d 319, 320 (App. Div. 2021) (noting that a corporation may only claim usury "as a defense to an action to recover repayment of a loan, and not as a basis for a cause of action asserted by the corporation for affirmative relief.").

Plaintiffs claim that they are, in fact, asserting usury as an affirmative defense "because the cause of action is only in response to Defendants' prior actions of trying to enforce the collection of its usurious loans outside of the court system." Pl. Opp. at 4, ECF No. 54. Because Plaintiffs were unable to raise the usury defense in the Connecticut confession-of-judgment action, they argue, they may now raise it here.[6] But, Plaintiffs cite no authority to justify their novel proposition that they should be treated as the defendants in this action.

Accordingly, the declaratory judgment claim is DISMISSED.

---

[5] Plaintiffs mention in a footnote that Connecticut has its own usury statute, and "[t]here does not seem to be any case law in Connecticut prohibiting an affirmative action for a declaration of usury under Connecticut law." Pl. Opp. at 5 n.3. The Court construes this footnote as seeking to add a claim under the Connecticut usury statute—not requesting that the Court interpret the existing New York usury claim under Connecticut law. Plaintiffs may move for leave to amend the complaint accordingly.

[6] It appears that the Connecticut action remains pending. *See MCA Receivables, LLC v. Christine D. Collins, PC*, Docket No. HHDCV226162897S (Conn. Super. Ct. filed Nov. 23, 2022).

II. <u>Fraud</u>

Under New York law, "[t]he elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages."[7] *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009). Plaintiffs allege that Defendants committed common-law fraud in at least two ways.

A. Fraudulent Inducement

First, Plaintiffs allege that Defendants "fraudulently induced Plaintiffs to enter into the [Agreement] by misrepresenting the amount and term of the loan and that there would be a subsequent contract" with more favorable terms. Compl. ¶ 176. In their response brief, Defendants do not dispute that Miller's pre-contractual statements to Plaintiffs were material misrepresentations made with knowledge of their falsity and intent to induce reliance. They argue, however, that Plaintiffs could not have justifiably relied on any oral representations that were contradicted by the written Agreement. Def. Mem. at 13–14.

"For New York common law fraud claims, whether a plaintiff's reliance is 'reasonable' depends on the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Langhamer v. Johnson*, No. 22 Civ. 5404, 2023 WL 6691017, at *8 (S.D.N.Y. Oct. 12, 2023). Reliance is often an "intensely fact-specific issue," and is "generally considered inappropriate for determination on a motion to dismiss." *Robinson v. Deutsche Bank Tr. Co. Americas*, 572 F. Supp. 2d 319, 322 (S.D.N.Y. 2008) (citation omitted). An exception exists, however, "where the alleged

---

[7] As mentioned above, the Agreement contains a choice-of-law clause specifying that Connecticut law applies. When jurisdiction is based on diversity, federal courts apply the choice-of-law rules of the forum state—here, New York. *Cotiviti, Inc. v. Deagle*, 501 F. Supp. 3d 243, 255–56 (S.D.N.Y. 2020). Under New York choice-of-law principles, "tort claims are outside the scope of contractual choice-of-law provisions." *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 335 (2d Cir. 2005). The choice-of-law clause, therefore, does not dispositively determine which law governs Plaintiffs' fraud claims. Because both parties rely on New York law in their briefing, the Court also assumes for the purposes of this motion that New York law governs the fraud claims. *See supra* at 7–8.

misrepresentation is explicitly contradicted by the written agreement"; in that case, courts have determined that reliance is unreasonable as a matter of law.  *Id.* at 323.

Here, the Agreement explicitly contradicts the terms of the alleged oral agreement Plaintiffs initially reached with Miller—a six-month loan carrying 20% interest, repaid monthly, with processing and underwriting fees of $1,000 each.  *See* Compl. ¶ 81; Agreement at 1.  Plaintiffs' reliance on the terms of the initial oral agreement is, therefore, unreasonable as a matter of law.

But, the Agreement does not expressly contradict Miller's alleged statement that "this was the standard documentation that had to be entered into, and once the loan was funded, the contract would be redrawn to reflect the numbers that they had discussed."[8]  *See* Compl. ¶ 84.  Plaintiffs allege that they are "unsophisticated business persons" who were not represented by counsel during the one-sided bargaining process.  *See id.* ¶ 210; *see Langhamer*, 2023 WL 6691017, at *9 ("[S]ophisticated parties are held to a 'higher standard' in assessing whether reliance on allegedly fraudulent misrepresentations is justifiable." (citation omitted)).  Further, upon noticing that the Agreement seemed different than had been discussed, Plaintiffs "undertook efforts to protect themselves, further justifying their claims of reasonable reliance," *Langhamer*, 2023 WL 6691017, at *10; they sought out an explanation and promise from Miller that the terms would not be binding.  Compl. ¶¶ 83–84.  Given the "fact-specific nature of the reasonableness of reliance," *Robinson*, 572 F. Supp. 2d at 324, as well as the inequality of the bargaining process, the Court declines to find Plaintiffs' reliance on Miller's alleged statement unreasonable at this stage.  "A jury may ultimately conclude that [Plaintiffs] should have known better than to rely on the [D]efendants' representations[,] . . . [b]ut this

---

[8] Although the Agreement does contain a broad merger clause, "a general merger clause does not, standing alone, preclude a claim of fraudulent inducement."  *Robinson*, 572 F. Supp. 2d at 323; *see* Agreement at 4 ("This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement . . . and supersede all prior agreements and understandings relating to the subject matter hereof.").

motion to dismiss does not permit such a finding as a matter of law." *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 902 F. Supp. 2d 476, 498 (S.D.N.Y. 2012).

      B.   Fraudulent Fees

      In their fourth cause of action, Plaintiffs allege that Defendants fraudulently charged "$71,500 in sham fees relating to the loan."  Compl. ¶ 177.  They contend that the "Origination Fee" and "Underwriting Fee" disclosed in the Agreement had no "relationship to any services actually rendered and instead were disguised interest charges." *Id.* ¶¶ 178–79.  Defendants respond that "the fees at issue were clearly disclosed in the parties' agreement," so Plaintiffs' allegations "articulate, at most, an alleged breach of contract."  Def. Mem. at 11–13.

      In *Haymount Urgent Care*, another court in this district dismissed a substantively identical claim for fraudulent fees arising from a similar MCA agreement.  609 F. Supp. 3d at 257.  There, the plaintiffs alleged that "defendants falsely represented that the fees were charged to offset actual fees and costs incurred by the MCA companies, when in fact the companies undertook no meaningful activities for which the fees were charged." *Id.*  The court found, however, that the MCA contract "plainly disclose[d] the existence and amounts of the fees," and the plaintiffs had made "no meaningful showing that liability for fraud lies where a business charged excessive fees that are prominently disclosed in the contract." *Id.*

      The *Haymount* court's reasoning is persuasive.  Here, as in that case, the Agreement makes clear that the Underwriting and Origination Fees, each a "[m]inimum of $1,000 or up to 15% of the [P]urchase [P]rice . . . shall be deducted from the Purchase Price" upfront.  Agreement at 8.  Plaintiffs allege that, "upon information and belief, Defendants charged [them] $71,500 in sham fees relating to

the loan." Compl. ¶ 177.[9]  But the Agreement permits Defendants to charge up to $37,500 (fifteen percent of the $250,000 purchase price) for each of the Underwriting and Origination Fees, or $75,000 total—an exorbitant sum, to be sure, but one "plainly disclose[d]" in the contract.[10] *Haymount*, 609 F. Supp. 3d at 257; *cf. Starr ex rel. Est. of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 111 (2d Cir. 2005) (holding that because a securities dealer "disclosed its fees, it cannot be said to have defrauded [plaintiff] simply because the fees were allegedly excessive.").  Plaintiffs do not allege that Defendants performed no underwriting or origination services, "[a]nd even if that allegation had been made, it would sound in breach of contract, not fraud." *Haymount*, 609 F. Supp. 3d at 257.

Accordingly, Defendants' motion to dismiss is DENIED as to Plaintiffs' fraudulent-inducement theory and GRANTED as to the fraudulent-fees theory.

III.   <u>Breach of Contract</u>

In their fifth cause of action, Plaintiffs allege, in the alternative, that Defendants breached the Agreement by "promis[ing] to advance certain amounts" but "not advanc[ing] the amounts as promised." Compl. ¶¶ 190–91.  Plaintiffs' breach-of-contract claim appears to arise from the same allegations as their fraudulent-fees claim.  *See* Compl. ¶ 15 (alleging that Ally, "who was supposed to advance $250,000 under this [A]greement, in fact only advanced $176,500, claiming [about] $75,000 in various 'fees'").

---

[9] Plaintiffs' fraudulent-fees claim also fails for another reason:  Under Rule 9(b)'s heightened pleading standard, "fraud pleadings generally cannot be based on information and belief." *Stern v. Leucadia Nat. Corp.*, 844 F.2d 997, 1003 (2d Cir. 1988).  An exception exists for "facts peculiarly within the opposing party's knowledge; even then, however, the allegations must be accompanied by a statement of facts upon which the belief is founded." *Id.*  Here, Plaintiffs have not demonstrated that the amount of fees and the services performed (or not performed) by Defendants are "peculiarly within" Defendants' knowledge, nor have they submitted any facts to substantiate their beliefs.

[10] Plaintiffs argue that the fee provisions "purposefully and deceptively imply that the fees will be minimal, in the area of $1,000." Pl. Opp. at 6.  But, they cite no authority for the proposition that the clause "[m]inimum of $1,000.00 or up to 15%" should be read as "in the area of $1,000." Agreement at 8.

Under Connecticut law, the elements of a breach of contract claim are "the formation of an agreement, performance by one party, breach of the agreement by the other party and damages."[11] *Tatum v. Oberg*, 650 F. Supp. 2d 185, 192 (D. Conn. 2009) (quoting *Rosato v. Mascardo*, 844 A.2d 893, 902 (Conn. App. Ct. 2004)).  Beyond its express terms, moreover, every contract carries an implied "duty of good faith and fair dealing." *Panciera v. Kemper Indep. Ins. Co.*, No. 13 Civ. 1009, 2014 WL 1690387, at *3 (D. Conn. Apr. 29, 2014).  This covenant "requir[es] that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 849 A.2d 382, 388 (Conn. 2004).  In particular, where a contract entitles one party to use discretion, the implied covenant of good faith and fair dealing sets an outer bound on that discretion by prohibiting the party from denying the counterparty, in bad faith, "benefits that he or she reasonably expected to receive under the contract." *Karas v. Liberty Ins. Corp.*, 33 F. Supp. 3d 110, 116 (D. Conn. 2014).  "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake regarding one's rights or duties, but by some interested or sinister motive." *Id.*

Defendants correctly note that the Agreement gave them discretion to deduct Underwriting and Origination Fees of up to $37,500 each.  Def. Mem. at 15; Agreement at 8.  The Agreement states, however, that these fees are "for underwriting fees, broker fees and related expenses" and "to cover cost of Origination and ACH Setup," respectively.  Agreement at 8.  Plaintiffs thus reasonably expected the deducted fees to bear some relation to these specified costs—not for Ally to deduct the full possible amount regardless of actual expenses. *Cf. Haymount*, 609 F. Supp. at 257 (noting that a

---

[11] The Court evaluates Plaintiff's claim for breach of contract under Connecticut law pursuant to the choice-of-law provision in the Agreement, *see* Agreement at 4, although New York and Connecticut law do not substantively differ as to the requirements of a breach-of-contract claim. *See, e.g.*, *Wilder v. World of Boxing, LLC*, 777 F. App'x 531, 533 (2d Cir. 2019).

claim that "the fees far exceed the costs for which they purport to relate . . . would sound in breach of contract").  Plaintiffs also adequately allege bad faith, claiming that Defendants intended to deceive them into believing that the Underwriting and Origination Fees were "legitimate fees charged to offset the costs of services."  Compl. ¶ 185.  In fact, they allege, Ally performed "little or no due diligence" and "conducted very little underwriting," approving the MCA transaction "in a matter of hours."  Compl. ¶¶ 178–83.

The Court finds, therefore, that Plaintiffs have adequately alleged breach of contract; specifically, breach of the implied covenant of good faith and fair dealing.[12]  Defendants' motion to dismiss the breach-of-contract claim is DENIED.

IV.     Violation of the CFAA

Finally, in their seventh cause of action, Plaintiffs allege that Defendants violated the CFAA by "logg[ing] into the PC's bank account in order to try to determine what other financial institutions the PC used."  Compl. ¶¶ 215–223.  To state a claim under the CFAA's private cause of action, Plaintiffs must plead that Defendants "(1) accessed a 'protected computer'; (2) 'without any authorization or exceeding its authorized access'; and (3) caused 'loss' in excess of $5,000." *LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 511 (S.D.N.Y. 2015) (citing 18 U.S.C. § 1030(g)).  Defendants argue that Plaintiffs "have not alleged that Defendants exceeded their authorized access," and "have failed to alleged damage or loss as defined in the statute."  Def. Mem. at 18.

---

[12] Defendants contend that Plaintiffs have not alleged their own performance of the Agreement, noting that Collins "placed a 'stop payment' on the daily Remittance and emptied [the PC's] bank account because she was surprised that [Ally] had deducted fees."  Def. Mem. at 17.  But under Connecticut law, a party is relieved of her obligations to continue performing under a contract that a counterparty has materially breached.  *See Bernstein v. Nemeyer*, 570 A.2d 164, 168 (Conn. 1990).  Defendants acknowledge that Collins only withdrew funds after Ally allegedly breached the agreement by deducting baseless fees; therefore, their argument fails.  *Cf. Young v. Citimortgage, Inc.*, No. 11 Civ. 01363, 2012 WL 4371532, at *2 (D. Conn. Sept. 24, 2012) ("It can reasonably be inferred from the complaint that customers performed their end of the agreement by paying more than they agreed when they were overcharged.").

The Court agrees that Plaintiffs have not adequately pleaded "loss" under the CFAA.[13]  The term is "construed narrowly" and encompasses "the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense."  *Redcell Corp. v. A.J. Trucco, Inc.*, No. 20 Civ. 18, 2022 WL 683007, at *6 (S.D.N.Y. Mar. 8, 2022) (quoting *LivePerson*, 83 F. Supp. 3d at 512).  "[A]lthough costs associated with lost competitive advantages, profits or revenue are not compensable under the CFAA, losses with respect to 'computer investigations or repairs' or 'measures taken to prevent unauthorized access to the computer system in the future' are recoverable."  *Id.* (quoting *Civic Ctr. Motors, Ltd. v. Mason St. Import Cars, Ltd.*, 387 F. Supp. 2d 378, 381–82 (S.D.N.Y. 2005)).  In short, loss under the CFAA "must relate to the victim's computer systems."  *LivePerson*, 83 F. Supp. 3d at 514.

Plaintiffs allege that Defendants used their online banking information "to freeze and levy against nearly $400,000 of Plaintiffs' money."  Compl. ¶ 221.  They do not allege, however, that they suffered any losses relating to their computer systems.  *LivePerson*, 83 F. Supp. 3d at 514.  And although Plaintiffs belatedly claim that the attorney's fees incurred in this action constitute loss under the CFAA, Pl. Opp. at 10, "allegations raised for the first time in an opposition brief cannot defeat a motion to dismiss, and such allegations do not automatically amend the complaint."[14]  *Lee v. Saul*, No. 19 Civ. 6553, 2022 WL 873511, at *4 (S.D.N.Y. Mar. 23, 2022).  The CFAA claim is, therefore, DISMISSED.

---

[13]  The Court expresses no view on Defendants' authorized-access argument.

[14]  Even if this argument were properly considered, "several courts across the country have concluded that litigation-related expenses do not qualify as 'losses' under the CFAA."  *Dreni v. PrinterOn Am. Corp.*, 486 F. Supp. 3d 712, 736 (S.D.N.Y. 2020) (collecting cases).

**CONCLUSION**

For the foregoing reasons, Defendants' motion to partially dismiss the complaint is DENIED with respect to Plaintiffs' causes of action for fraudulent inducement and breach of contract, but GRANTED with regard to Plaintiffs' claims for a declaratory judgment, fraudulent fees, and violation of the CFAA.  If Plaintiffs seek to amend their complaint, they shall move for leave by **February 27, 2024**.  The Clerk of Court is directed to terminate the motion at ECF No. 49.

SO ORDERED.

Dated:  January 23, 2024
      New York, New York

_____
ANALISA TORRES
United States District Judge